**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Michael Todd Dawson, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:17-cv-00676 |
| | ) | |
| vs. | ) | Judge Michael R. Barrett |
| | ) | |
| Assured Partners, NL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION & ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 31); (Doc. 32). Plaintiff filed a Response in Opposition[1] (Doc. 38), and Defendant filed a Reply (Doc. 39).

## I. BACKGROUND

Plaintiff worked for Defendant from June 2015 to December 2016. (Doc. 32-1 Michael Todd Dawson Depo. PageID 172, 177). Defendant is a national insurance brokerage company with offices across the United States. Plaintiff worked in Defendant's Cincinnati office doing employee benefits work. (*Id.* PageID 176). Plaintiff is an African American male. (Doc. 1 ¶ 14).

Suzi Bach interviewed, hired, and supervised Plaintiff. (Doc. 32-1 Dawson Depo. PageID 178); (Doc. 32-5 Suzi Bach Aff. ¶ 7). Ms. Bach is a white female. (Doc. 32-5 Bach Aff. ¶ 2). Ms. Bach's title is Operations Lead and she oversees Defendant's benefits

---

[1] Plaintiff requests oral argument. (Doc. 38). The Court does not deem oral argument essential to the fair resolution of this matter and denies Plaintiff's request. *See* S.D. Ohio Civ. R. 7.1(b)(2).

operations in the Cincinnati office. (*Id.* ¶¶ 3-6).

Teams comprised of a Benefits Analyst, Account Manager, Account Executive, and Producer work together to provide employee benefits solutions to Defendant's clients. (Doc. 32-1 Dawson Depo. PageID 181). One of those employee benefits solutions is a process called "renewal." "Renewal" is the process of renewing a company's employee benefit plan for the upcoming year, and involves obtaining quotes and pricing from different insurance carriers' and vendors' plans and policies, analyzing the different plan options, preparing marketing and plan materials for the client, double-checking all spreadsheets against the carriers' quotes, and assisting with the enrollment and employee notice process. (Doc. 32-5 Bach Aff. ¶ 18).

During any given renewal process for a client, the Benefits Analyst typically puts together spreadsheets and a presentation, with information provided by an Account Executive and checked by an Account Manager, that a Producer will give to a client to assist in the client's selection of a benefit plan for the upcoming year. (Doc. 32-8 Monica Howard Aff. ¶ 9). The Account Manager is an internal, service-based position that primarily manages day-to-day services such as billing, claims, eligibility, and service issues, and also checks Benefits Analysts' creation of spreadsheets and presentations during any given renewal process. (Doc. 32-1 Dawson Depo Exh. 15 PageID 266-68) (Account Manager Job Description); (Doc. 32-5 Bach Aff. ¶ 8); (Doc. 32-8 Howard Aff. ¶ 9). The Account Executive position is more strategic, client facing, and requires greater responsibility than the Benefits Analyst and Account Manager positions. (Doc. 32-1 Dawson Depo Exh. 14 PageID 264-65) (Account Executive job description); (Doc. 32-5 Bach Aff. ¶ 10). The Account Executive, during any given renewal process, requests

information from the client, that client's current insurance carrier, and other possible insurance carriers, and then shares that collected information with the Benefits Analyst to be placed in a spreadsheet and presentation. (Doc. 32-8 Howard Aff. ¶ 8). The Account Executive oversees a client's renewal process and directs the Benefit Analyst's and Account Manager's tasks. (*Id.* ¶ 10). The Producer position has the greatest contact with the client, finds and brings new clients to Defendant, and presents Defendant's renewal presentations to the client. (Doc. 32-1 Dawson Depo. PageID 181). Defendant sometimes uses Producers, who are not directly employed by Defendant, called "outside" Producers. *See* (Doc. 32-8 Howard Aff. ¶ 16). In Defendant's Cincinnati office, Ms. Bach assigns the Benefits Analyst, Account Manager, and Account Executive that will work as a team with a particular Producer and client. (Doc. 32-1 Dawson Depo. PageID 186).

Plaintiff's Employment Offer & Terms and Job Description, both of which he signed in May 2015, list his starting title as Account Executive. (*Id.* Exh. 14 PageID 264-65); (*Id.* Exh. 15 PageID 266-68). Plaintiff states that Defendant hired him to be an Account Executive. (Doc. 32-1 Dawson Depo. PageID 178). Ms. Bach states that Defendant hired Plaintiff in a hybrid Account Manager/Account Executive position that she created just for him. (Doc. 32-5 Bach Aff. ¶ 9). Plaintiff rejects Defendant's contention that he was hired in a hybrid position. (Doc. 32-1 Dawson Depo. PageID 178). He maintains that he was hired as an Account Executive and that his understanding was that, as part of his training and to learn the nuances of Defendant as a company, he agreed to start work as an Account Manager after which Defendant would transition accounts to him as an Account Executive after the training period was over. (*Id.*). He acknowledges that he acted as the Account Manager for some clients and the Account Executive for other clients. (*Id.*

PageID 186).

On October 5, 2015, Ms. Bach authorized Plaintiff to receive a merit increase in annual salary from $75,000.00 to $76,000.00. (Doc. 32-1 Dawson Depo. PageID 181); (*Id.* Exh. 17 PageID 274-75). Defendant's Employee Change Form memorializing that merit increase listed Plaintiff's job title as Account Executive. (*Id.* Exh. 17 PageID 274-75). That same month, Ms. Bach completed a 90-day Employee Performance Evaluation in which Ms. Bach assessed Plaintiff's overall performance as "outstanding." (*Id.*).

In early 2016, there was an issue on one Defendant's client's, LB, account that Plaintiff worked on as the Account Manager and Amy Jeffries worked on as the Account Executive. (Doc. 32-1 Dawson Depo. PageID 188). In particular, there was an issue with LB's renewal. *Cf.* (Doc. 32-5 Bach Aff. ¶¶ 17-23). After this issue, Defendant removed Plaintiff from LB's account. (Doc. 32-1 Dawson Depo. PageID 188-89); (Doc. 32-5 Bach Aff. ¶ 23). Plaintiff ascribes the mistake Ms. Jeffries, while Defendant ascribes the mistake to Plaintiff. *Compare* (Doc. 32-1 Dawson Depo. PageID 188-89), *with* (Doc. 32-5 Bach Aff. ¶¶ 17-23); (Doc. 32-7 Amy Jeffries Aff. ¶¶ 14-25).

Sometime later in 2016, but before May 2016, there was an issue on another of Defendant's client's, AE, account that Plaintiff worked on. (Doc. 32-1 Dawson Depo. PageID 187). Specifically, during a renewal, there was a mistake on the quoted insurance premium rates and a spreadsheet given to AE was missing pricing information for insurance premiums for dependents of covered employees, which shorted the cost of the medical plan by almost $30,000.00. *Cf.* (Doc. 32-5 Bach Aff. ¶¶ 24-26). AE selected a plan based on the incorrect spreadsheet and the mistake resulted in Defendant having to pay almost $10,000.00 to AE. *Cf.* (*Id.*). Plaintiff ascribes the mistake to Ms. Jeffries while

4

Defendant ascribes the mistake to Plaintiff. *Compare* (Doc. 32-1 Dawson Depo. PageID 187-88), *with* (Doc. 32-5 Bach Aff. ¶¶ 24-26); (Doc. 32-7 Jeffries Aff. ¶¶ 26-31).

In April 2016, Plaintiff and Ms. Bach completed his annual performance review. (Doc. 32-1 Dawson Depo. PageID 191-93); (*Id.* Exh. 21 PageID 332-39). Plaintiff's overall rating was a 3.650 out of 5.0. (Doc. 32-1 Exh. 21 PageID 337). The review listed Plaintiff's title as Account Executive and noted that he "currently has Account Manager and Account Executive responsibilities" and "[h]e will begin working with additional clients as the Account Executive and will have the opportunity to become more consultative." (*Id.* PageID 332, 334).

In May 2016, Defendant required Ms. Bach to eliminate one of the Account Manager positions from the Cincinnati office, as the office was over-staffed. (Doc. 32-5 Bach Aff. ¶ 27). To determine who would be terminated, Ms. Bach compared the two Account Managers with the lowest performance reviews: Plaintiff and Kimberly Loving, a white female. (*Id.*). Ms. Bach analyzed several metrics related to Plaintiff and Ms. Loving, including their respective books of business, current performance, and future expectations, and ultimately terminated Ms. Loving. (*Id.*); (*Id.* Exh. 1 PageID 612).

Also in May 2016, there was an issue on another of Defendant's client's, WT, account that Plaintiff worked on. (Doc. 32-1 Dawson Depo. PageID 189-90). Plaintiff acknowledges that he failed to report to the insurance carrier that one of WT's employee's employment had ended, but contends that Defendant should have made WT self-administrative to avoid this issue. (*Id.*). In May 2016, WT emailed Defendant seeking $5,623.08 in restitution in premiums that WT was required to pay for the terminated employee and noted that WT requested that the member be terminated on several prior

occasions to no avail. (Doc. 32-5 Bach Aff. ¶ 28); (Doc. 32-7 Jeffries Aff. ¶¶ 32-38).

Later in May 2016, Ms. Bach emailed Walt Konetzka, Defendant's Director of Human Resources, with a summary of her concerns about Plaintiff's on-the-job performance related to LB, AE, and WT, and guidance on how to address those concerns going forward. (Doc. 32-5 Bach Aff. ¶ 29); (*Id.* Exh. 2 PageID 615). Mr. Konetzka and Ms. Bach subsequently decided to place Plaintiff on a Performance Improvement Plan ("PIP"). (Doc. 32-5 Bach Aff. ¶ 30). Ms. Bach also informed Tim Devine, Defendant's Cincinnati Office's Director, of her concerns about Plaintiff's on-the-job performance and intention to place Plaintiff on a PIP. (*Id.* Exh. 2 PageID 614).

Ms. Bach met with Plaintiff to inform him of her concerns about his on-the-job performance related to LB, AE, and WT and intention to place him on a PIP. (Doc. 32-5 Bach Aff. ¶¶ 31, 34). On June 7, 2016, Ms. Bach placed Plaintiff on a PIP. (Doc. 32-1 Dawson Depo. PageID 193-95); (Doc. 32-1 Exh. 22 PageID 340); (Doc. 32-5 Bach Aff. ¶ 35). The PIP contained three objectives: follow company renewal procedures utilizing all available tools; proactive service; and ongoing education/skill development. (Doc. 32-1 Exh. 22 PageID 340). Plaintiff ascribes the need for the PIP to the mistake with WT, while Ms. Bach ascribes the need for the PIP to the mistakes with LB, AE, and WT. *Compare* (Doc. 32-1 Dawson Depo. PageID 193), *with* (Doc. 32-5 Bach Aff. ¶¶ 31, 34).

During their June 7, 2016 meeting, Plaintiff presented Ms. Bach with an undated document titled "Todd Dawson – AssuredPartners NL." (Doc. 32-1 Dawson Depo. Exh. 22 PageID 341); (Doc. 32-5 Bach Aff. ¶ 36); (*Id.* Exh. 3 PageID 619). The document indicates that its purpose is to "establish the direction for [Plaintiff's] current and future roles at [Defendant] and states that "I currently have a dual role as an Account Manager

(AM) and Account Executive (AE)." (Doc. 32-1 Dawson Depo. Exh. 22 PageID 341); (Doc. 32-5 Bach Aff. Exh. 3 PageID 619). Plaintiff successfully completed his PIP in the summer of 2016. (Doc. 32-1 Dawson Depo. PageID 193); (Doc. 32-5 Bach Aff. ¶ 41).

In late September 2016, Defendant started the renewal process for another client, SH. (Doc 32-1 Dawson Depo. PageID 205). Plaintiff, Monica Howard, Terry Van Zandt, Joseph Holt, and Matthew Larmann worked on the SH renewal in varying capacities. (*Id.* PageID 206). The parties agree that Mr. Larmann served as the outside Producer for Defendant's SH team. With respect to the roles of Plaintiff, Ms. Howard, Ms. Van Zandt, and Mr. Holt, the parties have very different accounts of who had what title, or titles, on Defendant's SH team and who was responsible for what work during the renewal process that lasted from September 2016 up until November 11, 2016, when Mr. Larmann and Ms. Howard gave the renewal presentation to SH. *Compare* (*Id.* PageID 201-231); (Doc. 38-20), *with* (Doc. 32-5 Bach Aff. ¶¶ 47-51); (Doc. 32-8 Howard Aff. ¶¶ 12-35); (Doc. 32-9 Terri Van Zandt Aff. ¶¶ 9-14).

With respect to Plaintiff's role on Defendant's client SH team, Plaintiff acknowledges that, on paper, he was assigned as the Account Executive, but states that, in reality, Ms. Howard was the Account Executive because SH is closely affiliated with a larger client, TKG, that Ms. Howard exclusively serves as the Account Executive and so she was to handle both SH and TKG as the Account Executive. *See, e.g.*, (Doc. 32-1 Dawson Depo. PageID 220-21, 224). Ms. Bach states that Plaintiff was assigned as both the Account Executive and Account Manager for SH and confirms that Defendant's papers reveal Plaintiff as being assigned as the Account Executive to SH. (Doc. 32-5 Bach Aff. ¶¶ 43, 45); (*Id.* Exh. 4 PageID 620-36). Ms. Bach states that, with respect to the

SH and TKG relationship, she expected Plaintiff to prepare the SH renewal as the Account Executive for SH and communicate that information to Ms. Howard who would then combine the SH renewal information with the TKG renewal information and present the combined information to Mr. Larmann. (Doc. 32-5 Bach Aff. ¶ 46). Ms. Howard and Ms. Van Zandt agree with Ms. Bach's understanding of Plaintiff's role on Defendant's client SH team. (Doc. 32-8 Howard Aff. ¶¶ 12-35); (Doc. 32-9 Van Zandt Aff. ¶¶ 9-14).

SH chose an insurance renewal plan included in the November 11, 2016 PowerPoint presentation that Mr. Larmann and Ms. Howard gave SH. On November 16, 2016, Plaintiff began the process to implement SH's chosen plan by collecting the necessary documents and signatures from SH. (Doc. 32-1 Dawson Depo. PageID 217-18). In doing so, and on November 18, 2016, Plaintiff discovered that there were errors in the presentation given to SH, knew that those errors could be costly to Defendant to fix, and brought those errors to Ms. Howard's and Ms. Bach's attention. (*Id.* PageID 219).

That same day, Ms. Bach sent the following email to Plaintiff, with Ms. Howard CC'd:

> Todd —
> Please let us know the pricing for C[  ] for [SH]. We must get this resolved this afternoon and get on the phone with Matt and explain our error. I need you to own this and get it resolved.
>
> When you call Matt, please have Monica on the phone with you.
>
> Suzi

(Doc. 32-5 Bach Aff. Exh. 6 PageID 660-61). Plaintiff responded that he was working on the requested pricing solution but was having issues reaching a person, versus a voice mail, and also asked Ms. Bach to discuss her statement that he "need[s] [] to own this and get it resolved." (*Id.*). Ms. Bach replied stating, among other things, "frankly you

should be handling [another pricing issue that Ms. Howard was handling] as the A[ccount Executive] on this case. As the A[ccount Executive], you are responsible for the client, just as any other A[ccount Executive] on the team would be." (*Id.*). Defendant ultimately was able to obtain a solution that did not cost SH extra money. (Doc. 32-8 Howard Aff. ¶ 42).

On November 21, 2016, Mr. Larmann requested that Plaintiff be removed from all of the accounts on which Mr. Larmann was a Producer, including SH, TKG, LB, AE, and WT, and Ms. Bach conveyed that request to Plaintiff. (Doc. 32-5 Bach Aff. ¶¶ 54, 55). That same day, Ms. Bach and Plaintiff met to discuss their versions of events regarding the SH incident. (*Id.* ¶ 56). Sometime after that November 21, 2016 meeting, Plaintiff put together a document titled SH "Timeline of Events" in which he included emails, email attachments, and his version of events. (Doc. 32-3 Dawson Depo. PageID 224); (*Id.* Exh. 26 PageID 517-Doc. 32-4 Dawson Depo. PageID 575). Plaintiff emailed this document to Ms. Bach, Mr. Konetzka, and Mr. Devine. (Doc. 32-1 Dawson Depo. PageID 223-24).

On November 23, Defendant received complaints from another client, MI, about Plaintiff's work on its account. (Doc. 32-5 Bach Aff. ¶ 60); (Doc. 32-5 Bach Aff. Exh. 8 PageID 669-80); (Doc. 32-7 Jeffries Aff. ¶ 41). On November 28, 2016, Ms. Bach and Plaintiff had another meeting to discuss the SH incident. (Doc. 32-1 Dawson Depo. PageID 224). Plaintiff recorded their conversation during that meeting. (*Id.*); (Doc. 32-4 Dawson Depo. Exh. 27 PageID 576-95). In addition to receiving Plaintiff's written version of the timeline of events for the SH incident, Ms. Bach collected a written version of the timeline from Ms. Howard and Mr. Holt. (Doc. 32-5 Bach Aff. ¶ 66); (*Id.* Exh. 11

PageID 688-749) (Ms. Howard); (*Id.* Exh. 12 PageID 750-52) (Mr. Holt).

Ms. Bach states that, on November 29, 2016, Mr. Devine determined that Plaintiff's employment with Defendant should be terminated. (Doc. 32-5 Bach Aff. ¶ 68). On November 30, 2016, Defendant received additional complaints regarding Plaintiff from Mr. Larmann's office. (Doc. 32-5 Bach Aff. ¶ 69); (Doc. 32-7 Jeffries Aff. ¶ 42); (Doc. 32-7 Jeffries Aff. Exh. 3 PageID 836-41). Defendant terminated Plaintiff on December 1, 2016. (Doc. 32-1 Dawson Depo. PageID 172). Mr. Konetzka and Ms. Bach held the December 1, 2016 termination meeting with Plaintiff. (*Id.* PageID 226); (Doc. 1-1 PageID 12-13); (Doc. 32-5 Bach Aff. ¶ 70). Plaintiff states that Mr. Devine, Mr. Konetzka, Ms. Bach, Ms. Howard, Ms. Jeffries, Ms. Van Zandt, and Mr. Holt were all involved in his termination. *See, e.g.*, (Doc. 32-1 Dawson Depo. PageID 158, 228).

Plaintiff owns and operates a private consulting company called Argentum that consults regarding employee benefits, Medicare, funeral pre-arrangements, property and casualty insurance, and financial related services. (*Id.* PageID 164, 167, 170). Plaintiff performed work for Argentum while he worked for Defendant. (*Id.* PageID 175, 232). Defendant was not aware that Plaintiff performed work for Argentum while he worked for Defendant. (Doc. 32-5 Bach Aff. ¶¶ 12, 74).

Plaintiff received his Notice of Right to Sue from the Equal Employment Opportunity Commission on July 11, 2017. (Doc. 1-1). His Complaint includes five counts: racial discrimination under federal and state law; sex discrimination under federal and state law; and intentional infliction of emotional distress.[2] (Doc. 1).

---

[2] Although Plaintiff pleads punitive damages as a separate count, "a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action." *Dalton v. Animas Corp.*, 913 F. Supp. 2d 370, 378 (W.D. Ky. 2012).

## II. __ANALYSIS__

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.* On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. Additionally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Starting with Plaintiff's claim for intentional infliction of emotional distress, Plaintiff did not respond to Defendant's Motion for Summary Judgment regarding this claim. *Compare* (Doc. 32 PageID 146-47), *with* (Doc. 38). In light of Plaintiff's failure to respond, the Court considers this claim abandoned and will grant Defendant's Motion for Summary Judgment as to this claim. *See Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (affirming finding that party's failure to properly respond to the arguments raised in a motion for summary judgment constituted an abandonment of those claims).

Turning to Plaintiff's discrimination claims, he alleges that Defendant unlawfully discriminated against him based on race and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Chapter 4112 of the Ohio[3] Revised Code. (Doc. 1). Federal caselaw interpreting Title VII is equally applicable to discrimination claims brought under Ohio law. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Com.*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (1981)); *see Arnold v. City of Columbus*, 515 F. App'x 524, 529 (6th Cir. 2013) ("The same analysis generally applies to claims under Title VII and the [Ohio Civil Rights Act]."). Accordingly, the following analysis applies to all of Plaintiff's claims brought under the federal and state anti-discrimination statutes.

In a case involving alleged discrimination on the basis of race or sex, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Rallins v. Ohio State Univ.*, 191 F. Supp. 2d 920, 928 (S.D. Ohio 2002) (citing *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir. 1997)). Plaintiff does not present direct evidence of race or sex discrimination and his claims rely on circumstantial evidence. His discrimination claims are thus subject to the *McDonnell*

---

[3] The record includes an Employment and Restrictive Covenants Agreement ("Agreement") that contains a choice of law provision that provides for the application of Florida law and a forum selection clause that provides for jurisdiction in the Middle District of Florida. (Doc. 32-1 Dawson Depo. Exh. 20 PageID 325-31). Plaintiff does not remember on what date he signed the Agreement, but does not dispute that he signed it. (*Id.* PageID 185); (Doc. 38-1 Michael Todd Dawson Decl.). Both parties utilize Ohio law in their briefing. (Docs. 32, 38, 39). Neither party challenges venue. Assuming without deciding that Plaintiff's discrimination claims fall within the scope of this Agreement and the forum selection clause is permissive and not mandatory, arguments neither party explicitly make or dispute, the Court finds that the parties have waived the Agreement's choice of law and venue provisions. *Cf. Meridia Products Liability Litigation v. Abbott Laboratories*, 447 F.3d 861, 865 (6th Cir. 2006); *Womack v. Wal-Mart Stores, Inc.*, 677 F. App'x 296, 297 (6th Cir. 2017); *C&S Outdoor Power Equip., Inc. v. Odes Indus. LLC*, No. 119CV01029STAJAY, 2019 WL 4197608, at *3 (W.D. Tenn. Sept. 4, 2019).

*Douglas* burden-shifting framework. *See Goetz v. City of Forest Park*, No. 11-CV-270, 2012 WL 4009512 (S.D. Ohio Sept. 12, 2012); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*McDonnell Douglas*, as subsequently modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), established a tripartite burden-shifting framework for evaluating discrimination claims in cases where a plaintiff relies on circumstantial evidence. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). First, "the plaintiff bears the initial 'not onerous' burden of establishing a prima facie case of discrimination by a preponderance of the evidence." *Id.* (quoting *Burdine*, 450 U.S. at 253). Second, if a plaintiff can establish a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 441 U.S. at 802). Third, if the defendant articulates such a reason, the burden shifts back to the plaintiff to present evidence that the non-discriminatory reason offered by the defendant was merely a pretext for discrimination. *Id.*

### a. Racial Discrimination

It is unlawful for an employer to terminate an employee on the basis of race under Title VII and Ohio's Civil Rights Act. 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02(A). To establish a prima facie case of racial discrimination under Title VII, a plaintiff must establish that he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) treated differently than similarly situated non-minority employees.[4] *Tennial v. United Parcel Serv., Inc.*, 840 F.3d

---

[4] Alternatively, a plaintiff can establish the fourth element by showing that he was replaced by a person outside of the protected class. Plaintiff does not make this alternative argument in this case.

292, 303 (6th Cir. 2016) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

Defendant concedes that Plaintiff is a member of a protected class and was subject to an adverse employment action. Defendant argues that Plaintiff cannot show that he was qualified for his position due to his on-the-job performance. (Doc. 32 PageID 143). Defendant's argument conflates the *McDonnell Douglas* stages of analysis. In effect, Defendant is using its "legitimate, nondiscriminatory reason for the employee's rejection," *Burdine*, 450 U.S. at 253, as a way to defeat Plaintiff's prima facie case. "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) ("At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000))). Plaintiff is a licensed insurance agent in, among other states, Ohio and has his Certified Employee Benefits Specialist ("CEBS") Certification, which requires two additional years of training beyond normal insurance licensing. (Doc. 32-1 Dawson Depo. PageID 166); (Doc. 32-5 Bach Aff. ¶ 9). The Court finds that he was qualified for his Account Executive position or hybrid Account Executive and Account Manager position.

Defendant also argues that Plaintiff cannot point to similarly situated employees that were not in a protected class and that were treated differently for similar conduct. (Doc. 32 PageID 139-43). To establish that a similarly situated employee in a non-protected class was treated more favorably, Plaintiff must identify "one or more comparators who are similarly situated in all relevant respects." *Robinson*

*v. Georgia-Pac. Corrugated, LLC*, No. 1:18-CV-307, 2020 WL 473543, at *4 (S.D. Ohio Jan. 29, 2020) (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2012)).[5]

The Sixth Circuit has focused on whether a plaintiff and comparator (1) share the same supervisor; (2) are subject to the same standards; and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Robinson*, 2020 WL 473543, at *4 (citing *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480-81 (6th Cir. 2008)). "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004). Exact correlation is not necessary, but a plaintiff and his comparators must be similar in all relevant respects. *See Robinson*, 2020 WL 473543, at *4 (citing *Bobo*, 665 F.3d at 753). Plaintiff identifies three potential comparators: Terry Van Zandt, Monica Howard, and Amy Jeffries. (Doc. 38 PageID 1230).

Ms. Van Zandt is a white female. (Doc. 32-9 Van Zandt Aff. ¶ 2). She was a Benefits Analyst and then an Account Manager for Defendant during the time that Plaintiff worked for Defendant. (Doc. 32-1 Dawson Depo. PageID 181); (Doc. 32-9 Van Zandt Aff. ¶¶ 3-4). Ms. Van Zandt reported to Ms. Bach during the time that Plaintiff worked for Defendant. (Doc. 32-9 Van Zandt Aff ¶ 5). Defendant has never given Ms. Van Zandt a negative performance review, removed Ms. Van Zandt from any client accounts due to

---

[5] "*Bobo* was abrogated on other grounds by *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013) (holding that Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation standard applicable to status-based Title VII discrimination claims set forth in 42 U.S.C. § 2000e-2(m))." *Jones v. Johnson*, 801 F. App'x 338, 348 (6th Cir. 2020).

performance issues or a Producer's request, or placed her on a PIP. (*Id.* ¶¶ 20-22).

Ms. Howard is a white female. (Doc. 32-8 Howard Aff. ¶ 9). She was an Account Executive at Defendant while Plaintiff worked there. (Doc. 32-1 Dawson Depo. PageID 179); (Doc. 32-8 Howard Aff. ¶ 5). Ms. Howard reported to Ms. Bach during the time that Plaintiff worked for Defendant. (Doc. 32-8 Howard Aff. ¶ 6). Defendant has never removed Ms. Howard from any client accounts due to performance issues or a Producer's request. (*Id.* ¶ 47). It is not clear whether Defendant has given Ms. Howard a negative performance review or placed her on a PIP. *See* (*Id.* ¶¶ 1-48).

Ms. Jeffries is a white female. (Doc. 32-7 Jeffries Aff. ¶ 2). She was an Account Executive at Defendant while Plaintiff worked there. (Doc. 32-1 Dawson Depo. PageID 179); (Doc. 32-7 Jeffries Aff. ¶¶ 2-3). Ms. Jeffries reported to Ms. Bach during the time that Plaintiff worked for Defendant. (Doc. 32-7 Jeffries Aff. ¶ 5). Defendant removed Ms. Jeffries from one client's account due to that client's request based on Ms. Jeffries's communication style. (*Id.* ¶ 44). Defendant has never given Ms. Jeffries a negative performance review, removed her from any client accounts due to a Producer's request, or placed her on a PIP. (*Id.* ¶ 43, 45-46).

Plaintiff and Ms. Van Zandt are not similarly situated in all relevant aspects because, although they both reported to Ms. Bach, they did not share a job title, responsibilities, or expectations. *See Leadbetter*, 385 F.3d at 691. However, and construing the facts in Plaintiff's favor for purposes of Defendant's Motion for Summary Judgment, the Court finds that Plaintiff demonstrates that there is a genuine issue of material fact as to whether Ms. Howard and Ms. Jeffries are apt comparators, as they had similar job titles, responsibilities, expectations, and each reported to Ms. Bach. *See id.*

Moreover, although the parties' accounts of the SH incident are vastly different, Ms. Howard participated in the SH incident and Defendant did not terminate her. Likewise, Defendant removed Ms. Jeffries from a client's account due to her on-the-job performance and did not terminate Ms. Jeffries.

Defendant's offered legitimate, non-discriminatory reason for terminating Plaintiff is Plaintiff's on-the-job performance, specifically the poor quality and quantity of mistakes that Plaintiff made, and his failure to take ownership for those mistakes. (Doc. 32 PageID 144). Plaintiff does not appear to challenge Defendant's production of this reason and the Court finds that Defendant meets its burden of production. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814-15 (6th Cir. 2011).

A plaintiff may demonstrate that an employer's proffered legitimate reason for an adverse employment action is pretextual on any of three grounds: (1) by showing that the reason has no basis in fact; (2) by showing that the reason did not actually motivate the employer's action; or (3) by showing that the reason was insufficient to motivate the action. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). "But this three-pronged analysis should not be applied so rigidly as to miss the point; the bottom-line inquiry is whether 'the employer fire[d] the employee for the stated reason or not[.]'" *Robinson*, 2020 WL 473543, at *7 (quoting *Heffernan v. U.S. Bank Nat. Ass'n*, No. 1:13CV001, 2014 WL 3408594, at *12 (S.D. Ohio July 10, 2014)).

Plaintiff raises a genuine issue of material fact as to whether Defendant's reasons for terminating him—poor performance and refusal to take ownership for mistakes—were false, as he disputes that he was the Account Executive on the SH account and that the mistakes in the presentation given to SH were his "to own." As noted, the parties have

vastly different interpretations of who had what title, or titles, on the SH team and who was responsible for what work during the renewal process up until November 11, 2016, when Mr. Larmann and Ms. Howard gave the inaccurate renewal presentation to SH. *Compare* (Doc. 32-1 Dawson Depo. PageID 201-231); (Doc. 38-20), *with* (Doc. 32-5 Bach Aff. ¶¶ 47-51); (Doc. 32-8 Howard Aff. ¶¶ 12-35); (Doc. 32-9 Van Zandt Aff. ¶¶ 9-14). Although this is far from the strongest case that the Court can imagine, the Court is not satisfied that no rational factfinder could conclude that Plaintiff's termination was discriminatory, and will deny summary judgment on Plaintiff's race discrimination claim, but only to the extent that Plaintiff has alleged less favorable treatment using Ms. Howard and Ms. Jeffries as comparators. *See Robinson*, 2020 WL 473543, at *9.

### b. Sex Discrimination

It is unlawful for an employer to terminate an employee on the basis of sex under Title VII and Ohio's Civil Rights Act. 42 U.S.C. § 2000e-2(a)(1); Ohio Rev. Code § 4112.02(A). Because Plaintiff is a male, his sex discrimination claim constitutes a reverse discrimination claim. *See Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569 (6th Cir. 2009); *Pastura v. CVS Caremark*, No. 1:11-CV-400, 2012 WL 6738660, at *9 (S.D. Ohio Dec. 31, 2012); *Nilles v. Givaudan Flavors Corp.*, No. 1:10-CV-919, 2012 WL 1537613, at *7 (S.D. Ohio May 1, 2012), *aff'd on other grounds*, 521 F. App'x 364 (6th Cir. 2013); *accord Ragozzine v. Youngstown State Univ.*, 2 F. Supp. 3d 1051, 1067 (N.D. Ohio 2014), *aff'd*, 783 F.3d 1077 (6th Cir. 2015); *Bonfiglio v. Toledo Hosp.*, No. 3:16CV2163, 2018 WL 5761220, at *6 (N.D. Ohio Nov. 1, 2018); *Burse v. Nashville Cmty. Care at Bordeaux*, No. 3:17-CV-01117, 2018 WL 2560400, at *5 (M.D. Tenn. June 4, 2018), *report and recommendation adopted*, No. 3:17-CV-01117, 2018 WL 3157019

(M.D. Tenn. June 28, 2018).

To establish a prima facie case of reverse sex discrimination, the Sixth Circuit uses a modified four-element analysis and, to satisfy the first element, a plaintiff must demonstrate background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority, and, to satisfy the fourth element, the plaintiff must demonstrate that similarly situated employees were treated differently. *Simpson*, 359 F. App'x at 569; *Nilles*, 2012 WL 1537613, at *7; *Bonfiglio*, 2018 WL 5761220, at *6. The second and third elements, that the plaintiff must demonstrate that he is qualified for the job and was subject to an adverse employment action, remain the same. *Simpson*, 359 F. App'x at 569; *Nilles*, 2012 WL 1537613, at *7; *Bonfiglio*, 2018 WL 5761220, at *6.

Plaintiff fails to present any evidence which supports a suspicion that Defendant is the rare employer who discriminates against the majority. (Doc. 38 PageID 1221); *see Pastura*, No. 1:11-CV-400, 2012 WL 6738660, at *9; *Nilles*, 2012 WL 1537613, at *7. Although Ms. Bach, a female, hired and supervised Plaintiff, the ultimate decision to terminate him came from Mr. Devine, Defendant's Cincinnati Office's Director, a male. (Doc. 32-5 Bach Aff. ¶ 68). Plaintiff fails to satisfy his prima facie case for reverse sex discrimination.

### c. After-Acquired Evidence

Defendant argues that it is entitled to summary judgment on the question of damages under the after-acquired evidence defense. (Doc. 32 PageID 147-49); (Doc. 39 PageID 2026). This defense "applies to bar an employee from obtaining certain remedies in a discrimination case. Where an employer can show it would have been entitled to

19

terminate the employee for severe wrongdoing, if it had known of the employee's wrongdoing at the time, the employee's remedies for discrimination are limited." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168 (6th Cir.), *opinion amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996); *accord McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 359-61 (1995) (holding that evidence of an employee's wrongdoing, acquired by the employer after the adverse employment action, does not alter the fact of the employer's liability, but rather "must be taken into account" in deciding the appropriate remedy); *see McMurray v. Eastman Chem. Co.*, No. 2:16-CV-270, 2018 WL 1803203, at *7 n.10 (E.D. Tenn. Apr. 16, 2018) ("This defense, though it acts as a rampart against the recovery of certain damages, 'cannot be used to shield a defendant from *liability*.'" (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 513 (6th Cir. 2006) (emphasis in original))). As a general rule, under this doctrine, the employee is barred from obtaining front pay and reinstatement, and backpay is limited. *Thurman*, 90 F.3d at 1168.

"An employer must establish a pair of elements to stake its right to summary judgment under the after-acquired evidence defense: '[1] that the wrongdoing in fact occurred' and '[2] that the wrongdoing was of such severity that the employee in fact would have been terminated.'" *McMurray*, 2018 WL 1803203, at *7 (quoting *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1154 n.5 (6th Cir. 1995)). Defendant alleges that the following wrongdoings occurred while Plaintiff worked for it: he operated Argentum and emailed several documents belonging to Defendant and its clients to his personal and Argentum email addresses. (Doc. 32 PageID 148-49); (Doc. 32-5 Bach Aff. ¶¶ 71, 74-77). Defendant argues that the consulting work violates its Conflicts of Interest Policy and emailing company documents to those email addresses violates its Code of

Ethics and Plaintiff's Employment and Restrictive Covenants Agreement. (Doc. 32 PageID 148); (Doc. 32-5 Bach Aff. ¶¶ 71, 74-77). Plaintiff acknowledges that he continued to work for Argentum for the limited purpose of answering any past clients' questions that arose and forwarded company documents to his email accounts to be able to work from home and protect himself in a discrimination lawsuit. (Doc. 32-1 Dawson Depo. PageID 175-76, 236). Plaintiff states that he uses his Argentum email addresses for professional and personal purposes. (*Id.* PageID 164, 232-33).

It is not clear if Defendant would have ultimately terminated Plaintiff for these actions or if it would have disciplined him without resorting to termination. Ms. Bach states that, if she had known that Plaintiff continued to operate Argentum and sent documents belonging to Defendant to his personal email accounts, Plaintiff would have been disciplined or terminated. (Doc. 32-5 Bach Aff. ¶¶ 74-76). Ms. Bach then states that, if she had known that Plaintiff sent documents belonging to Defendant to his Argentum's email addresses just days before his termination, he would have been terminated for violating Defendant's policies with respect to maintaining confidentiality of client and other proprietary information. (*Id.* ¶ 77).

It is not clear if Plaintiff has a personal email address that is not otherwise associated with Argentum. *See, e.g.*, (Doc. 32-1 Dawson Depo. PageID 232-33). It is also not clear, if Plaintiff's personal email addresses are all associated with Argentum, why Defendant would terminate Plaintiff for emailing himself company documents days before he was terminated and why Defendant would alternatively just discipline Plaintiff for emailing himself company documents on other prior occasions. *Compare* (Doc. 32-5 Bach Aff. ¶¶ 74-76), *with* (*id.* ¶ 77). The record, when considered in the light most

favorable to Plaintiff, establishes that Defendant has not satisfied its burden for summary judgment under the after-acquired evidence defense, as it has not established that Plaintiff's wrongdoing was of such severity that he would have been terminated. *See Wehr*, 49 F.3d at 1154 n.5; *McMurray*, 2018 WL 1803203, at *7.

### d. Jury Demand and Fees

Plaintiff's Complaint includes a jury demand. (Doc. 1). The Employment and Restrictive Covenants Agreement that Plaintiff signed, *see supra* note 3, contains a jury trial waiver provision. (Doc. 32-1 Dawson Depo. Exh. 20 PageID 331). Defendant moves to strike Plaintiff's jury demand, arguing that the parties agreed to a jury trial waiver in that Agreement. (Doc. 32 PageID 149-50); (Doc. 39 PageID 2027-28). Plaintiff responds that Defendant waived its right to enforce Plaintiff's jury trial waiver in the Agreement, as waiver is an affirmative defense and Defendant did not plead that Plaintiff waived his right to a jury trial in its Answer. (Doc. 38 PageID 1231). Plaintiff alternatively argues that the Agreement's jury waiver provision is unenforceable against him. (*Id.* PageID 1231).

The Seventh Amendment of the U.S. Constitution holds that, "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. Federal Rule of Civil Procedure 39 provides that, if a jury trial is demanded, it must be provided unless the parties stipulate to a nonjury trial or, the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial. FED. R. CIV. P. 39(a). Moreover, "[i]t is clear that the parties to a contract may by prior written agreement waive the right to trial by jury." *K.M. C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755 (6th Cir. 1985). Such a waiver must be "knowing and voluntary." *Id.* at 755-56. The party objecting to enforcement of a jury waiver provision

bears the burden of proving that its consent to the waiver was not "knowing and voluntary." *Id.* at 758.

Here, the Agreement provides:

**JURY TRIAL WAIVER AS TO ALL CLAIMS**

**EMPLOYEE AND COMPANY EACH HEREBY KNOWINGLY WAIVES ANY RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING RELATED TO OR ARISING OUT OF ANY CLAIMS . . . OR THE TERMINATION OF SUCH EMPLOYMENT, INCLUDING ANY CLAIMS OF DISCRIMINATION. THE PARTIES AGREE THAT THIS WAIVER OF THE RIGHT TO A JURY TRIAL IS KNOWING, VOLUNTARY, AND FREE FROM DURESS OR COERICION. THE PARTIES UNDERSTAND THAT THEY HAVE A RIGHT TO CONSULT WITH A PERSON OF THEIR CHOOSING, INCLUDING AN ATTORNEY, BEFORE SIGNING THE AGREEMENT.**

(Doc. 32-1 Dawson Depo. Exh. 20 PageID 331) (emphasis in original). Plaintiff does not remember the date on which he signed the Agreement, but does not dispute that he signed it. (Doc. 32-1 Dawson Depo. PageID 185); (Doc. 38-1 Dawson Decl.). He states that Defendant "did not discuss the waiver of a jury trial or anything else in the agreement before [he] signed the document." (Doc. 38-1 Dawson Decl. ¶ 7).

Starting with Plaintiff's argument that Defendant waived its right to enforce the Agreement's jury trial waiver provision by not including the argument in its Answer, the Court is not persuaded that Federal Rules of Civil Procedure 8 and 12 apply to Defendant's motion to strike. *Cf. Kinzel v. Bank of Am.*, No. 3:10-CV-02169, 2013 WL 4679938, at *2 (N.D. Ohio Aug. 30, 2013). Plaintiff cites no authority to support his position that Defendant had to plead its contractual jury waiver defense or that contractual jury waiver defenses generally constitute "waiver" as an affirmative defense or avoidance under Rule 8(c). *See* (Doc. 38 PageID 1231). The Court finds that Federal Rule of Civil Procedure 39 applies, and Rule 39(a)(2) does not establish a deadline for the filing of a

motion to strike the jury demand. *See Integrated Mgmt. Sys., Inc. v. Basavegowda*, No. 17-13764, 2020 WL 7075279, at *1 (E.D. Mich. Dec. 3, 2020).

Turning to Plaintiff's alternative argument, although he asserts in his unsworn Response in Opposition that the Agreement is an unconscionable adhesion contract, he did not enter into the entire Agreement voluntarily, he was not presented with it until after he accepted the job, and there was no equal bargaining power, he cites nothing to support these assertions. (Doc. 38 PageID 1231). The Court is not convinced that Plaintiff's consent to the Agreement's jury waiver provision was not knowing, voluntary, or intentional. *See K.M. C. Co.*, 757 F.2d at 755. The Court finds that the Agreement's jury trial waiver provision is applicable to Plaintiff's remaining race discrimination claims.

As a final matter, in discussing the Agreement's jury trial waiver provision, Defendant references the Agreement's Attorneys' Fees section. (Doc. 32 PageID 149); *see* (Doc. 32-1 Dawson Depo. Exh. 20 PageID 330). Plaintiff does not directly respond to Defendant's reference to the Agreement's Attorneys' Fees provision. (Doc. 38 PageID 1231). To the extent that Defendant attempts to argue that it is entitled to attorneys' fees and costs from Plaintiff under the Agreement, the Court finds any argument to be premature and not properly briefed.

III.    **CONCLUSION**

In light of the foregoing, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 31) is **GRANTED in part** with respect to Plaintiff's reverse sex discrimination and intentional infliction of emotional distress claims and **DENIED in part** with respect to Plaintiff's race discrimination claims. It is further **ORDERED** that the trial in this matter will be a trial to the bench. In that respect, in lieu of jury instructions, the parties are to submit proposed findings of facts and conclusions of law, and the Court will provide more information and a deadline for such submissions during an upcoming follow up telephone status conference.

   **IT IS SO ORDERED.**       _/s Michael R. Barrett_____
                     Michael R. Barrett, Judge
                     United States District Court