IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL TODD DAWSON, | : | Case No. 1:17-cv-00676 |
| | : | |
| Plaintiff, | : | Judge Michael R. Barrett |
| | : | |
| v. | : | **MEMORANDUM OF DECISION** |
| | : | **ISSUED PURSUANT TO** |
| ASSURED PARTNERS, NL, LLC, | : | **FED. R. CIV. P 52(a)(1)** |
| | : | |
| Defendant. | : | |

On October 9, 2017, Plaintiff Michael Todd Dawson initiated this civil action by filing a five-count Complaint against his former employer, Defendant AssuredPartners, NL, LLC, alleging race and reverse sex discrimination (in violation of federal and state law)[1] and intentional infliction of emotional distress (in violation of state common law). (Doc. 1 PAGEID 7–11.)[2] On September 23, 2019, Defendant filed a Motion for Summary Judgment as to all claims. (Docs. 31, 32). On May 10, 2021, the Court granted Defendant's Motion with respect to Plaintiff's reverse sex discrimination and intentional infliction of emotional distress claims and denied it as to Plaintiff's race discrimination claims. (Doc. 48). Plaintiff's race discrimination claims were later tried to the Court[3] over

---

[1] Specifically, Plaintiff contends that Defendant unlawfully discriminated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Chapter 4112 of the Ohio Revised Code.

[2] Although Plaintiff pled punitive damages as a separate count, "a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action." *Dalton v. Animas Corp.*, 913 F. Supp. 2d 370, 378 (W.D. Ky. 2012).

[3] (*See* Part II.d of Opinion & Order on Defendant's Motion for Summary Judgment, Doc. 48 PAGEID 2073–75).

a five-day period, from April 18–22, 2022, during which ten witnesses testified[4]. (Docs. 68–72). After due consideration, and in accord with Fed. R. Civ. P. 52(a)(1), the Court first finds the following facts specially and then states its conclusions of law separately.

## I.    FINDINGS OF FACT[5]

Plaintiff Michael Todd Dawson worked for Defendant AssuredPartners, NL, LLC ("AssuredPartners") in its Cincinnati office for approximately 18 months, from June 2015 to December 2016.

AssuredPartners is a national insurance brokerage firm. It "places" employee benefits coverage for its customers through a team that includes a Proposal Analyst, an Account Manager, an Account Executive, and a Producer.

A Producer markets AssuredPartners' services and brings in customers—in other words, he or she acts as a rainmaker. A Producer can be "inside" (that is, an AssuredPartners employee) or "outside." An outside Producer brings his or her *own* clients to AssuredPartners for service, effectively making him or her a customer of AssuredPartners as well.

The Account Executive has overall responsibility for a customer's account while the Account Manager manages the day-to-day administrative tasks of the account (such

---

[4] The Court heard testimony from Plaintiff Michael Todd ("Todd") Dawson; current Account Manager (and former Proposal Analyst) Terri Van Zant; current Senior Account Executive Monica Howard; former Proposal Analyst Joe Holt; current Operations Leader Kathleen Suzanne ("Suzi") Bach; retired Director of Human Resources Walt Konetzka; current Account Executive Amy Jeffries; (outside) Producer Matthew ("Matt") Larmann; Plaintiff's spouse Dora Dawson; and current Assured Partners customer (in her capacity as Controller of Modern Ice) Lori Shook.

[5] The parties submitted proposed findings of fact in advance of trial. (Docs. 65, 66). Simultaneous post-trial briefs also were filed on May 6, 2022. (Docs. 76, 77). The Court informed the parties that it would not need a transcript of the proceedings to render its forthcoming Memorandum of Decision.

as billing, claims, eligibility, and service issues).  The Account Executive was described during testimony as the "quarterback" of the client team.

Employee benefit plans must be renewed annually.  The first step requires a decision to "shop" (meaning go out into the market to see if there are other similar plans with a better price) or "not shop" (meaning contact with the current provider as to the price for coverage renewal)[6].  A "shop" renewal typically involves securing quotes from different carriers; analyzing the options; preparing marketing and plan materials for the customer to review; double-checking spreadsheets and marketing materials against carrier quotes; and, once a plan is selected, assisting the customer with enrollment and employee notifications.

The Account Executive supervises the renewal process.  A Proposal Analyst puts together a spreadsheet and PowerPoint that the Producer, along with the Account Executive, present to the customer to assist in the selection of a benefits plan.[7]  The Account Manager checks the Proposal Analyst's spreadsheet and PowerPoint for accuracy.[8]

Kathleen Suzanne ("Suzi") Bach is the Employee Benefits Operations Leader for the Cincinnati office.  In this role, Bach hires and supervises all Proposal Analysts, Account Managers, and Account Executives.  And she is solely responsible for assigning

---

[6] Dawson described this as asking the current provider for "a best and final offer" not to shop.

[7] A typical spreadsheet will contain present-day and renewal rates from the current provider, as well as quotes from other carriers, broken down in categories like deductible, co-insurance, office visit, specialist visit, emergency room co-pay, and pharmacy.

[8] The Court does not credit Dawson's (self-serving) testimony that the Account *Executive* (and not the Account Manager) checks spreadsheets (in detail) for accuracy, which is at odds with the credible testimony of Operations Leader Suzi Bach, as well as long-time Account Executives Monica Howard and Amy Jeffries.

the Proposal Analyst, Account Manager, and Account Executive that will work as a team with a particular Producer and client.

Bach, who is white, hired Todd Dawson, who is African American.  She viewed his race as a "positive" because it added diversity to the Cincinnati office.[9]  Bach supervised Dawson from hire through termination.

Dawson applied for an advertised Account Manager position.  After Bach reviewed Dawson's resume and interviewed him, she concluded he was Account Executive "material."  She was impressed that he had a Certified Employee Benefits Specialist ("CEBS") certification, which requires two-to-three (or more) years additional training beyond normal insurance licensing.  She also was impressed with his personality and professional demeanor.  As a result, she created a hybrid "Account Manager/Account Executive" role for Dawson and received (Human Resources) approval to pay him approximately $20,000 more (per year) than he would have made as an Account Manager.  The Employment Offer & Terms (PX1) and the Job Description (PX2) sent to Dawson states that he would be employed as an "Employee Benefits Account Executive".  Bach, however, credibly testified that Dawson (and his AssuredPartners co-workers) understood he would function in this unique role, sometimes serving as Account Manager and sometimes serving as Account Executive.[10]  Bach envisioned Dawson assuming

---

[9] The Cincinnati office has more than 100 employees.  Dawson was the only African American.

[10] Dawson denies being hired in a hybrid role.  He testified that he was hired to be an Account Executive only and was assigned Account Manager duties as "training."  The Court does not credit Dawson's testimony.  As noted, Dawson applied for an Account Manager position and Bach sought approval to pay Dawson a salary in between the range for an Account Manager and an Account Executive.  If Dawson had been hired as an Account Executive only, Bach's interface with Human Resources would make no sense.

Account Executive responsibility for (outside) Producer Matt Larmann's smaller (under 50 lives) clients.

Bach conducted a 90-day review of Dawson on October 2, 2015, rating his overall performance as "5= Outstanding." (PX13). She authorized a $1,000 "merit" increase in Dawson's annual salary. (Id.).[11]

In February 2016, an issue arose with the renewal for AssuredPartners client Landrum & Brown ("L&B").[12] Amy Jeffries, who is white, was the Account Executive; Dawson was assigned as the Account Manager. As the Account Manager, Dawson was responsible to process the plan change, confirm open enrollment data, and verify that insurance identification cards were mailed to L&B's employees near the renewal date. These tasks were not completed properly, however. In addition, L&B's health insurance carrier failed to process L&B's benefits changes as of the (January 1, 2016) effective date for the new policies. Although this issue was an oversight on the part of the carrier, Dawson, as Account Manager, was nonetheless responsible to ensure that the plan change was properly processed and updated with correct information. Also, the "Benefits Guide" that Dawson prepared for L&B contained multiple errors and referenced the incorrect plan. L&B requested that Dawson be removed from its service team. Dawson was not disciplined for these errors. Instead, Bach counseled him about the importance of using AssuredPartners checklists and tools during the renewal process.

---

[11] Bach authorized less ($750) for Kimberly Loving, a white Account Manager. (DX154).

[12] Matt Larmann is the (outside) Producer for L&B. L&B has been his client since 1984.

An issue also arose with the renewal for AssuredPartners client Aberdeen Express.[13]  As with L&B, Jeffries was the Account Executive and Dawson the Account Manager.  Dawson oversaw the preparation of a spreadsheet designed to help Aberdeen Express employees compare different healthcare plans.  But the spreadsheet did not include the standard fields that AssuredPartners includes in its spreadsheets for clients and, as a result, omitted individual rate details and excluded premiums for dependents. Because of these errors, Aberdeen Express was presented with an inaccurate (by $30,000) benefits proposal.  AssuredPartners "settled" with Aberdeen Express for just under $10,000.  (DX159).[14]  Dawson was not disciplined for these errors.

Dawson's annual performance review occurred in April 2016.  (PX14).  His overall rating was 3.650/5.000.  (Id. (TD0769)). Regarding Dawson's "Essential Duties", Bach commented: "Todd currently has Account Manager and Account Executive responsibilities.  He will begin working with additional clients as the Account Executive and will have the opportunity to become more consultative."  (Id. (TD0766)).  Bach also commented: "Todd has been developing skills and familiarizing himself with available tools so that he will be successful in managing additional clients as the AE."  (Id.).  And, overall, Bach remarked: "Todd will continue to develop his knowledge regarding carrier products and company resources available to clients.  He will expand his AE responsibilities with larger clients, being accountable for all aspects of service and planning.  I am confident that Todd will become a trusted consultative resource to his

---

[13] Matt Larmann is the (outside) Producer for Aberdeen Express.  Aberdeen Express has been his client since the 1980s.

[14] In addition, (outside) Producer Matt Larmann "cut" his commission from Aberdeen Express to make up for Dawson's errors.

clients." (Id. (TD0769)). The review does not mention Dawson's shortcomings on the L&B and Aberdeen Express accounts.

In May 2016, Bach was told to eliminate one of the Account Manager positions from the Cincinnati office. She considered Dawson[15] and Kimberly Loving, who is white. Bach terminated Loving. Loving's annual BOB ("book of business") revenue was substantially larger than Dawson's[16] and her annual salary was (approximately) $18,000 lower than his. (DX158). But Bach was far more critical of Loving's "Current Performance" than Dawson's. Still, she described Dawson as "[v]ery capable, but is currently not owning the client relationship for those clients that he is the AE on. During his review, we discussed the need for him to step up and become the primary contact on those clients and he will be receiving additional clients as the AE." (Id.).

Later in May, Bach learned of another mistake Dawson made as the Account Manager for AssuredPartners (house) client Winton Transportation. Amy Jeffries (again) was the Account Executive. In November 2015, Winton Transportation informed Dawson of an employee termination. It asked Dawson to terminate the employee from the medical insurance carrier effective November 1, 2015, which he failed to do. Timely communication of a termination is necessary to comply with COBRA notice requirements and to ensure that the client is not charged premiums for the former employee. In January 2016, Winton Transportation renewed its request. Dawson submitted the information to the COBRA carrier, but not the medical insurance carrier (Anthem). Winton

---

[15] Bach identified Dawson's position as "AE/AM" hybrid. (DX158).

[16] At trial, Bach explained that Loving was assigned to larger AssuredPartners accounts that brought in more revenue.

Transportation followed up two more times, in February 2016 and in March 2016. As a result of Dawson's failure to fully process the termination, Winton Transportation continued to be billed for the terminated employee's health insurance premiums. In May 2016, legal counsel for Winton Transportation sought more than $5,000 in restitution from AssuredPartners. Dawson persuaded Anthem to reimburse Winton Transportation for all but $1,250. (DX160).[17]

On May 24, 2016, Bach sent an email to Walt Konetzka, AssuredPartners (since retired) Director of Human Resources. (DX159). She described in detail the mistakes Dawson had made and commented:

> I recently assigned several clients to him that he would be managing as the AE. I will reassign them this week. I need to address the overall issue, Todd does not have the necessary skills to be successful in his role. It has impacted the three clients below and possibly others that I am not aware of at this point. **I** will be discussing this with Tim [Devine, Managing Director for the Cincinnati office] tomorrow, but **expect that we will want to move forward with termination of employment.**

(Id. (DEF000335) (emphasis added)).

Bach met with Dawson the next day, May 25, 2016. She emailed Konetzka afterward, copying Devine, recounting in part:

> I told him that the fact that this is the third issue in the past 6 months was very troubling and had Tim's attention. He said he understood that each issue had cost us money and he understands that this is a big deal. He made the comment that he hoped his overall performance wasn't being based on this issue and I reiterated that in the past 6 months - there have been three issues that he has been involved in that have caused us a considerable amount of time and in 1 case $9800, not to mention creditability (sic).

---

[17] Bach "reached out to [her] counterpart at Anthem to ask for additional help[.]" (DX160 (DEF000337)). It is unclear what, if anything, happened as a result.

(DX160 (DEF000337)). Bach stated she intended to draft a PIP ("Performance Improvement Plan") for Dawson. (Id.). She subsequently emailed Konetzka, copying Devine, on June 7, 2016, telling him that "[w]e discussed the PIP[18] and [Todd] was very receptive and asked questions about a few items." (DX161 (DEF000342)). Dawson brought his own written plan (DX163),[19] which, Bach testified, impressed and encouraged her that Dawson was "taking responsibility". Bach met with Dawson weekly to review his progress; Dawson successfully completed his PIP in August 2016.

In late September 2016, Dawson began the renewal process for AssuredPartners client Sharon Hill Daycare. Sharon Hill shared common ownership with AssuredPartners (larger mid-market) client Kreller Group,[20] but their employee benefit plans were separate. Matt Larmann was the (outside) Producer for both entities. Monica Howard, who is white, was the Account Executive for Kreller. Dawson was listed as both the Account Executive and Account Manager for Sharon Hill on the AssuredPartners internal workflow lists. (*See* DX169, DX170, DX172, DX177, DX190, DX195). Howard credibly testified that "leaders" of Kreller Group made the final decision as to Sharon Hill's benefits renewal. Howard also credibly testified that, because of this "unique" relationship, she—as Account Executive for Kreller—had a "vested interest" in the Sharon Hill account.

Dawson contacted Sharon Hill's then-current health insurance provider, Humana, to obtain rate information for the renewal. Larmann asked AssuredPartners to "shop" the

---

[18] (DX162).

[19] Dawson presented Bach with a memorandum "to establish the direction for my current and future roles at AssuredPartners NL." (DX163 (DEF000344)). Dawson noted that, "I currently have a dual role as an Account Manager (AM) and Account Executive (AE)." (Id.).

[20] Bach testified that Joe Davidoski "owns" both Kreller Group and Sharon Hill Daycare.

9

renewal,[21] so, in early October 2016, Dawson contacted the client to obtain census and payroll information to seek quotes for alternative coverage.

AssuredPartners Account Executives held weekly meetings (at 9:00 a.m. on Monday mornings) to discuss project status.  When asked about Sharon Hill, Dawson would respond that he didn't have an answer or that no progress had been made.  Howard expressed her frustration to Bach about Dawson.  Bach instructed Howard to let Dawson do the work because he was the Account Executive for Sharon Hill.  Worried that the renewal presentation materials would not be finished on time, and because (outside) Producer Matt Larmann was pestering her, Howard stepped in.  Proposal Analyst Joe Holt was "super swamped",[22] so Terri Van Zandt was asked to "spread" the information.  Bach credibly testified that she didn't expect Van Zandt's work product to be as good as Holt's would've been.  This was Van Zandt's first (and only) spreadsheet and Bach characterized Van Zandt as doing the team "a favor".[23]  Bach knew that a careful review would be necessary, meaning that the spreadsheet needed to be checked against the SBC ("Summary of Benefits and Coverage").  Howard asked Dawson (on November 11, 2016) to review the Sharon Hill renewal presentation materials (to include the spreadsheet prepared by Van Zandt) and correct any errors.  In her words, it needed to be "client ready".  Howard credibly denied that she told Dawson to just look at "the financials", meaning the premium rates.  Dawson did not review the spreadsheet as

---

[21] Larmann explained that the percentage increase that Humana proposed was "sizable", "no one" was going to shop it, and "I said we need to shop it".

[22] (*See* DX199 (DEF000380)).

[23] Van Zandt functioned as a Proposal Analyst for only two months.  Bach promoted her to Account Manager after an employee unexpectedly separated.

instructed; he sent the "client ready" materials to Howard, who, in turn, forwarded them to Larmann.

Sharon Hill ultimately decided to switch health insurance carriers, from Humana to Anthem. On November 17, 2016, however, Dawson told Howard that the spreadsheet was inaccurate because it didn't match the SBC for the proposed Anthem plan. Bach instructed Dawson to contact Conexis, a COBRA administrator, to obtain pricing for Sharon Hill. In an email dated November 18, 2016 (and copying Howard), Bach told Dawson "I need you to own this and get it resolved." (DX185 (DEF000366)). She instructed him to "get on the phone with Matt and explain our error." (Id.). She further instructed him to "please have Monica on the phone with you." (Id.). About a half an hour later, in response to Dawson's email asking her what she meant by him "owning" and "resolving" the issue, Bach wrote "Monica is contacting Cherisse to see if there are any options available closer to what was sold, but frankly you should be handling that as the AE on this case. As the AE, you are responsible for the client, just as any other AE on the team would be." (DX186 (DEF000384)). And she cautioned "Matt needs to know what is going on and what we are doing to fix it. I don't want you to call him alone because I expect Matt to get very upset after what happened with Aberdeen last year. He is losing confidence in us all together." (Id.). Bach, Howard, and Dawson spoke with Larmann by telephone on November 21, 2016. Dawson said little, despite Bach asking him to lead the conversation.[24] Howard apologized; Dawson did not. (*See* DX197 (DEF000376–

---

[24] According to Bach, Dawson barely said "two words". According to Jeffries, "Todd just shut down."

377)).  Larmann called Bach afterward and asked her to remove Dawson from all his accounts.[25]

Bach met with Dawson (later) on November 21, 2016 and asked for his "perspective" on the Sharon Hill renewal issues; Dawson responded that he preferred to respond in writing.[26]  Bach told Dawson then that "everyone makes mistakes", but, as the Account Executive, she was disappointed that he disclaimed responsibility for them and was disconnected from the team's effort to resolve the problem.  (DX191).  As before, Bach emailed Konetzka and Devine afterward.  (Id.).  Devine responded: "It seems not only has he not accepted the responsibility on this matter and does not understand how serious this matter is.  His response is not acceptable.  No sense of urgency on his part is very concerning. . . . Our clients deserve nothing less than excellent service from us. He clearly sounds like he does not get this."  (DX193 (DEF000346)).

Separately, but also on November 21, 2016, Amy Jeffries received an email from Lori Shook, the Controller at AssuredPartners client Modern Ice.[27]  (DX202 (DEF000634–635)).  Jeffries was the Account Executive and Dawson the Account Manager.  Shook had called Jeffries the previous Friday (November 18, 2016).  Sent as a follow-up, Shook's laundry list of complaints about Dawson's (lack of) customer service were divided into "Some items we discussed" and "A few things we didn't discuss[.]"  (Id. (DEF000635)).  Jeffries forwarded Shook's email to Bach (on November 23, 2016), who,

---

[25] (See DX196 ("Suzi, this cannot continue.  I am being exposed as are you to financial risk, reputation risk, risk of losing the account and other lines of business and not to mention the time spent fixing the mistakes.  I am at a complete level of zero confidence and would ask you to removeTodd from my clients accounts.")).

[26] Bach also asked Howard (DX197), Holt (DX201, DX199), and Van Zandt for their accounts as well.

[27] Matt Larmann is the (outside) Producer of Modern Ice.

in turn, forwarded it to Konetzka and Devine (on November 28, 2016). (Id. (DEF000634)). Shook credibly testified that she had received "exceptional" service from AssuredPartners save for the renewal when Dawson was the Account Manager, whom she described as "inept".[28] Jeffries credibly testified that Shook "was historically easy to work with" and "had never known her to be unreasonable".

Several other events occurred on November 28, 2016. Bach and Dawson met to discuss the Sharon Hill renewal.[29] (DX200). Shortly before their meeting, Dawson emailed to Bach his written version of events. (PX51 ("SHARON HILL TIMELINE OF EVENTS")). Bach was frustrated that Dawson took time to prepare a document to argue he was not to blame; instead, she believed, he should take responsibility for the errors or assist with efforts to correct them. During the meeting, Dawson stated that he didn't review or check "in detail" Van Zandt's spreadsheet, a circumstance that Bach characterized as "alarming" during her testimony.

Walt Konetzka terminated Todd Dawson on December 1, 2016; Suzi Bach was present at this brief (five-minute) meeting.

Monica Howard began employment with AssuredPartners predecessor Neace Lukens in June 2007. (PX105). She was hired as an "Strategic" Account Executive by (inside) Producer David Fuller. Howard was not assigned Account Manager duties as "training" for her Account Executive role.

Suzi Bach became Howard's supervisor in 2011, when AssuredPartners acquired Neace Lukens. Bach assigned Howard to be the Account Executive for (outside)

---

[28] Shook also credibly testified that she didn't know that Dawson was "black".

[29] Dawson surreptitiously recorded their conversation.

Producer Matt Larmann's clients Kreller Group and Sharon Hill Daycare in 2013.  In that role, she handled the renewals for both in 2013 and 2014.  Howard and Dawson "worked [the renewals] together" in 2015 because Dawson was new to AssuredPartners and he was slated to replace Howard as Account Executive for Sharon Hill in 2016.

Howard was promoted to Senior Account Executive at AssuredPartners in spring 2018.  She has never been removed (at a Producer's request) from servicing an account.  She has never been placed on a PIP.

<u>Amy Jeffries</u> began employment with AssuredPartners as an Account Executive in 2012.[30]  Previously, she was an Account Executive with Benefit Resources where she worked with (outside) Producer Matt Larmann.  One of the accounts she serviced was Kreller Group when it was a Benefit Resources client.  Jeffries testified that she had "difficulty" with Kreller decision-maker Harvey Rosen over a rate error and the resulting tax consequences.  Once at AssuredPartners, she was not assigned to Kreller or Sharon Hill Daycare because Larmann decided that she and Rosen didn't "mesh".[31]  There is no evidence in the record that Jeffries was (in any way) responsible for the rate error.  Rather, she simply called it to Rosen's attention.

(Inside) Producer David Fuller removed Jeffries as Account Executive from Dinosal Plastics in 2017, post-dating Dawson's termination.  A decision-maker there ("Jackie") told Fuller that Jeffries was "not polished".  There is no evidence in the record that Jeffries committed any errors in servicing this client.

Jeffries has never been placed on a PIP.

---

[30] Jeffries testified that she has never been an Account Manager.

[31] (Outside) Producer Matt Larmann testified that Jeffries *was* assigned as Account Executive once at AssuredPartners and he requested that she be replaced.

Matthew ("Matt") Larmann testified as President of Larmann Financial, which he described as an employee benefits business.  He uses AssuredPartners to service his clients.  Larmann is not involved in their "day-to-day" dealings, but rather fields complaints from his clients when a service provider falls short.  Larmann considers himself to be a "customer" of AssuredPartners.

Larmann has a long-standing working relationship with Suzi Bach and Amy Jeffries and has known Monica Howard since at least 2013.  He described Jeffries as someone who "respects" his clients and "does whatever it takes" to service them.  He noted that he typically receives unsolicited compliments about Jeffries from his client L&B.  That said, he will replace "anyone", Jeffries included, if need be. He candidly—and credibly — testified that he has "a short temper".

Larmann also credibly testified that (1) prior to Dawson's hire, no one from L&B, Aberdeen Express or Sharon Hill complained about the service provided by AssuredPartners, (2) since Dawson was removed from (all) his accounts, no client has complained about the service provided by AssuredPartners, and (3) the complaints he received from his clients during the renewals were specific to Todd Dawson.

## II.    CONCLUSIONS OF LAW

Dawson contends that AssuredPartners unlawfully discharged him because of his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII")[32] and Chapter 4112

---

[32] Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discharge any individual, . . . because of such individual's race[.]"  42 U.S.C. § 2000e-2(a)(1).

of the Ohio Revised Code[33].[34]  Intentional discrimination claims under Title VII can be proven by either direct or circumstantial evidence.  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648–49 (6th Cir. 2012).[35]  "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  Id. at 865.  Dawson presented no direct evidence of race discrimination at trial.  Instead, he presented circumstantial evidence from which he argues that the Court should infer a discriminatory motive.  *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–349.  Dawson's race discrimination claims, therefore, are subject to the *McDonnell Douglas* burden-shifting framework.  Id.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), established a tripartite burden-shifting framework for evaluating discrimination claims in cases where a plaintiff relies on circumstantial evidence.  *White v. Baxter Healthcare*

---

[33] In Ohio, it is "an unlawful discriminatory practice[.] . . [f]or any employer, because of the race[.] . . of any person, to discharge without cause[.]"  Ohio Rev. Code § 4112.02(A).

[34] Federal caselaw interpreting Title VII is equally applicable to discrimination claims brought under Ohio law. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) (citing *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Com.*, 66 Ohio St. 2d 192, 196, 421 N.E.2d 128, 131 (1981)); *see Arnold v. City of Columbus*, 515 F. App'x 524, 529 (6th Cir. 2013) ("The same analysis generally applies to claims under Title VII and the [Ohio Civil Rights Act].").

[35] "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both."  *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997).

*Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).  First, "the plaintiff bears the initial 'not onerous' burden of establishing a prima facie case of discrimination by a preponderance of the evidence."  Id. (quoting *Burdine*, 450 U.S. at 253).  Second, if a plaintiff can establish a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 441 U.S. at 802).  Third, if the defendant articulates such a reason, the burden shifts back to the plaintiff to present evidence that the non-discriminatory reason offered by the defendant was merely a pretext for discrimination. Id.

To establish a prima facie case of race discrimination under Title VII, a plaintiff must show that he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) treated differently (that is, less favorably) than similarly situated non-minority employees[36].  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)).

As to the fourth element, a plaintiff must identify "one or more comparators who are similarly situated in all relevant respects."  *Robinson v. Georgia-Pac. Corrugated, LLC*, No. 1:18-cv-307, 2020 WL 473543, at *4 (S.D. Ohio Jan. 29, 2020) (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2012)).[37]  To this end, courts in the Sixth Circuit focus whether a plaintiff and comparator

---

[36] Alternatively, a plaintiff can establish the fourth element by showing that he was replaced by a person outside of the protected class.  Dawson did not do so here.

[37] "*Bobo* was abrogated on other grounds by *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013) (holding that Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation standard

(1) share the same supervisor, (2) are subject to the same standards, and (3) have engaged in the same conduct without such differentiating (or mitigating) circumstances that would distinguish their conduct or the employer's treatment of them for it.  *Robinson*, 2020 WL 473543, at *4 (citing *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480–81 (6th Cir. 2008)).  "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004).  Exact correlation is not necessary, but a plaintiff and his comparators must be similar in all *relevant* respects.  *See Robinson*, 2020 WL 473543, at *4 (citing *Bobo*, 665 F.3d at 753) (emphasis added).

Applying these precedents to the facts specially found, the Court states the following conclusions of law.

**Dawson did not meet his burden of establishing a prima facie case of race discrimination by a preponderance of the evidence.**  There is no dispute that Dawson meets the first two elements:  he is African American and was terminated.  Regarding the third element, the undersigned previously determined that Dawson was qualified for his position, whether it be as Account Executive or as a hybrid Account Manager/Account Executive.  (*See* Doc. 48 PAGEID 2065).  Additionally, and as to the fourth element, the undersigned previously determined that Terri Van Zandt was not an apt comparator but found a genuine issue of material fact as to whether Monica Howard and Amy Jeffries were.  (*Id.* PAGEID 2066–68).  Having heard the testimony and reviewed the exhibits, the undersigned concludes that Howard and Jeffries also are not apt comparators.

---

applicable to status-based Title VII discrimination claims set forth in 42 U.S.C. § 2000e-2(m))." *Jones v. Johnson*, 801 F. App'x 338, 348 (6th Cir. 2020).

True, Bach supervised all three.  But the similarity begins and ends there.  Bach hired Dawson as a (distinct-to-him) hybrid Account Manager/Account Executive.  Howard and Jeffries, in contrast, were hired as Account Executives and neither functioned initially as an Account Manager for "training" purposes.  Both Howard and Jeffries had years and years of experience as Account Executives with unblemished records.  Unlike Dawson, no (inside or outside) Producer ever asked that Monica Howard be removed from servicing an account for any reason.  Unlike Dawson, no (inside or outside) Producer ever asked that Amy Jeffries be removed from servicing an account because she made mistakes.  Rather, she was removed on two occasions—once before Dawson was hired and once after Dawson was fired—because of personality conflicts with the client decision-makers.  Finally, unlike Dawson, neither Howard nor Jeffries has ever been placed on a PIP.  These distinctions are significant.

"The lack of a similarly situated comparator is not always fatal to a prima facie case, so long as the plaintiff points to 'additional evidence,' beyond establishing the first three prima facie elements, that indicates discriminatory intent in light of common experience."  *Jefferson v. Intelligrated, Inc.*, No. 1:18-cv-00894, 2021 WL 4224714, at *6 (S.D. Ohio Sept. 16, 2021) (citing *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009)); *accord Hatcher v. Cuyahoga Metro. Hous. Auth.*, No. 1:20-cv-02508, 2022 WL 2116965, at *7–8 (N.D. Ohio June 13, 2022).  This "additional evidence" depends upon the particular facts and circumstances of a given case.  *Lindsay*, 578 F.3d at 418.  For example, in *Lindsay*, a case in which the Sixth Circuit analyzed the *McDonnell Douglas* framework in the housing discrimination context, the Court determined that the suspicious timing of the termination of a purchase agreement, within a few days after the seller

discovered the buyers were African American, provided a sufficient evidentiary basis for inferring the seller acted with a racially discriminatory motive. Id. at 419–20.

Here, and unlike the Sixth Circuit's decision in *Lindsay* and the undersigned's summary judgment decision in *Jefferson*, there simply is no "additional evidence" from which the Court can infer race discrimination. Suzi Bach did everything she could to *not* fire Todd Dawson despite his multiple costly errors (over an 18-month time span) and steadfast refusal to "own"—that is, take full responsibility and fix—any of them.[38] Moreover, there is no record evidence of any race-related statements made to or about Dawson by any AssuredPartners employee or client. And there is no evidence of racial animus toward Dawson by any AssuredPartners employee or client.[39] *See Hatcher*, 2022 WL 2116965, at *9.

Dawson argues that racial animus should be inferred because the other members of the team, who are all white, were not disciplined like he was. In other words, if any "mistake" is made on the account, AssuredPartners must mete out discipline to the *entire* service team to ensure fairness and forestall discrimination. But as Defendant correctly observes in its post-hearing brief, "Plaintiff arrives at this conclusion by simply ignoring the nature of the mistakes at issue, who was at fault for these mistakes, and the overall

---

[38] As AssuredPartners accurately recounts in its post-trial brief, "There is **nothing** in the record to reflect that Bach harbored any racial animus towards Dawson whatsoever. To the contrary, the record is clear that Bach hired Dawson for a better job than the one he applied for, believed in Dawson, liked him personally, heavily invested in him as an employee, and made decision after decision in Dawson's favor, including saving his employment from termination on two separate occasions." (Doc. 76 PAGEID 2750 (emphasis in original)). Applying the "same actor" inference, *see Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003), Dawson "must offer strong evidence of pretext to demonstrate that [Bach] discriminated on the basis of race by firing [him] even though it appears she did not discriminate when hiring [him]." *Garrett v. Sw. Med. Clinic*, 631 F. App'x 351, 357 (6th Cir. 2015) (cleaned up). As the Court will discuss, Dawson offers no credible evidence of pretext.

[39] In fact, there was no testimony from AssuredPartners employees about animus of *any* kind. Bach, Howard, Jeffries, Holt, and Van Zandt all credibly testified about how much they liked Dawson.

history of customer service issues surrounding Dawson's employment (as compared to Amy Jeffries and Monica Howard, who have many years of exemplary performance and no comparable history of 'mistakes' or client complaints)."  (Doc. 76 PAGEID 2738–39). Dawson asks the Court to overturn AssuredPartners' business decisions to discipline *him* and *not* discipline Howard and Jeffries.  It is well-settled, however, that "a federal court may not second-guess an employer's business judgment."  *Booker v. Dee Sign Co.*, No. 1:06cv667, 2008 WL 839786, at *8 (S.D. Ohio Mar. 26, 2008) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (cleaned up)).[40]

Because he did not establish that white comparators were treated differently than him, and because he did not produce "additional evidence" that indicates discriminatory intent in light of common experience, Dawson fails to state a prima facie case of race discrimination.  AssuredPartners, therefore, is entitled to final judgment in its favor.

**Even if Dawson *had* established a prima facie case of race discrimination, such that the burden of production shifted to AssuredPartners to articulate a legitimate, nondiscriminatory reason for his termination,[41] Dawson did not present credible evidence of pretext.**  "In the third and final stage of the *McDonnell Douglas*

---

[40] In a similar vein, Plaintiff's counsel emphasized during closing argument that "no one was checking Todd Dawson's work."  That's right.  But, as AssuredPartners aptly observes in its post-hearing brief, that's because "***no one was responsible*** for 'triple checking' the spreadsheets that the Account Manager is supposed to double-check.  The Proposal Analyst prepares the comparison spreadsheets.  The Account Manager double-checks them.  The Account Executive presents them.  There is nothing discriminatory about this approach[.]"  (Doc. 76 PAGEID 2741 n.4 (emphasis in original)).

[41] Dawson did not challenge AssuredPartner's proffered legitimate, non-discriminatory reason for terminating him on summary judgment (*see* Doc. 48 PAGEID 2065) or at trial (Doc. 77 PAGEID 2756–57).

21

analysis, the presumption of discrimination is gone and the plaintiff must demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 815 (6th Cir. 2011) (citing *Burdine*, 450 U.S. at 256[42]). A plaintiff may demonstrate that an employer's proffered legitimate reason for an adverse employment action is pretextual on any of three grounds: (1) by showing that the reason has no basis in fact; (2) by showing that the reason did not actually motivate the employer's action; or (3) by showing that the reason was insufficient to motivate the action. *White*, 533 F.3d at 393. "But this three-pronged analysis should not be applied so rigidly as to miss the point; the bottom-line inquiry is whether 'the employer fire[d] the employee for the stated reason or not[.]'" *Robinson*, 2020 WL 473543, at *7 (quoting *Heffernan v. U.S. Bank Nat'l Ass'n*, No. 1:13cv001, 2014 WL 3408594, at *12 (S.D. Ohio July 10, 2014) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012))). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? **This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is.** One can distill the inquiry into a number of component parts, and it can be useful to do so. But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (citations

---

[42] "The plaintiff retains the burden of persuasion. [ H]e now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that [ h]e has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

omitted) (emphasis added); *Zilner v. Neuronetics, Inc.*, No. 1:21CV1912, 2023 WL 5748732, at *5 (N.D. Ohio Aug. 31, 2023) (citing *Chen*); *Perkola v. Univ. of Mich. Bd. of Regents*, No. 16-12602, 2018 WL 1522436, at *14 (E.D. Mich. Mar. 28, 2018) (citing *Chen*).

Dawson argues all three grounds, adding that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext."  (Doc. 77 PAGEID 2757 (quoting *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996 (citations omitted))[43]).  In support, his counsel contends:

> Suzi testified ad nauseum that Todd was terminated for the mistakes on the Sharon Hill renewal because he was the Account Executive so ultimately it was his responsibility as the Account Executive to double check Terri Van Zandt's comparison spreadsheets and the PowerPoint presentation and catch Terri's mistakes.  But when asked why she didn't hold Amy Jeffries to this same standard as the Account Executive, when the mistakes happened on the comparison spreadsheets for the Aberdeen Express renewal, Suzi then changed her story and the new narrative was it was Todd's <u>sole</u> responsibility to catch Joe Holt's mistakes on the Aberdeen Express comparison spreadsheets because Todd was the account manager, and it was not the Account Executive's job.  And at trial Amy Jeffries testified that both her and Todd were the Account Executive on the Landrum and Brown renewal but again Todd was the only person held responsible for all of the mistakes on the Landrum and Brown renewal and the Benefits Guide.  So, Suzi Bach changed her story again and the new narrative was that Todd was fired because he didn't 'own it' and accept responsibility for his mistakes.  But the evidence showed that Todd did take ownership for his mistakes, he just refused to take <u>sole</u> ownership for the mistakes by his white colleagues on every account.

(Doc. 77 PAGEID 2757–58 (footnote omitted) (emphasis in original)).  The record evidence, however, belies these assertions.

---

[43] This general proposition remains good law in the Sixth Circuit.  *See George v. Youngstown State Univ.*, 966 F.3d 446, 462–63 (6th Cir. 2020).

Suzi Bach consistently—and credibly—testified that the Account Manager is responsible for checking the accuracy of the Proposal Analyst's spreadsheet entries.  So did Monica Howard and Amy Jeffries[44].  *Only* Todd Dawson testified that the Account *Executive* is supposed to "look at the spreadsheet and cross-check the details."

Dawson testified that he was told he was being fired "because of Sharon Hill."  In support of pretext, counsel argues that Bach told Dawson she wasn't looking to "place blame" and needed this event to be a "learning opportunity".   Dawson also testified that he was the Account Executive for Sharon Hill Daycare "in name only".  In practice, Monica Howard was the Account Executive and he did "whatever Monica asked [him] to do."  In support of pretext, counsel argues that Bach placed sole blame on Dawson because *he* was the Account Executive.

That is an oversimplification of witness testimony.  Howard was tied to Kreller Group and (outside) Producer Matt Larmann, a demanding and impatient (but apparently valued) AssuredPartners customer.   In this capacity, she assumed certain Account Executive functions for the Sharon Hill renewal.   But all along, Dawson (on paper and in practice) was the Account *Manager* for Sharon Hill and it is in *this* capacity that he failed to follow Howard's instruction to check the accuracy of (brand new employee) Van Zandt's spreadsheet entries.

In support of pretext, counsel further argues that Dawson's mistakes regarding other clients (L&B, Aberdeen Express, and Winton Transportation) could not, for lack of a better word, "count" as part of the decision to terminate because Bach did not include them in his annual performance review.  The Court is unpersuaded.  Dawson's errors as

---

[44] Specific to Sharon Hill, Jeffries explained that she would have looked at the SBCs, but not critically proofread them against Van Zandt's spreadsheet.

to L&B and Aberdeen Express were otherwise documented.  Legal counsel for Winton Transportation did not send AssuredPartners a demand letter until May 2016, after Dawson's review.  At that point, Dawson was placed on a PIP.  Just three months after he successfully completed his PIP, the Sharon Hill debacle ensued, his *fourth* material mistake since his hire 18 months earlier, which resulted in Larmann telling Bach he was "at a complete level of zero confidence" and wanted Dawson removed from *all* his accounts.  This ask was problematic, if for no other reason than the fact that Bach hired Dawson with the thought that he would be assigned as the Account Executive to Larmann's smaller (under 50 lives) clients.  And, on top of all this, Modern Ice added its bad experience with Dawson to the mix.  All of these events, and more, underpinned the decision to terminate.  Dawson presents no evidence that AssuredPartners "made up" any of them to hide its intention to fire him because he is African American.

### III.    AWARD

The Court finds in favor of Defendant AssuredPartners, NL, LLC, and against Plaintiff Michael Todd Dawson, on Dawson's federal and state law claims of race discrimination.  The Clerk is hereby directed to enter judgment (pursuant to Fed. R. Civ. P. 58) accordingly.

**IT IS SO ORDERED.**

/s/ *Michael R. Barrett*
Michael R. Barrett, Judge
United States District Court